I think at a minimum, there are some material issues of fact which must be left to the trier of fact, which would prevent summary judgment as against my client, the Appellant Dr. Phan. The first one is the change in the form of payment in the essay from the prepayment to postpayment. I'm sorry, Your Honor. The first issue of materiality, I blew the water. I'll be fine. Thank you, Your Honor, is whether the change in the form of payment in the Form S-8 was material. I think that's something that should be left to the trier of fact rather than to the trial court. There's no doubt that the — Is this with respect to the Section 5 or the 10b-5 issue? It actually affects both of them, actually all three of them. If the — with regard to the Section 5 allegation, if it was not material that the form of payment is changed, then there would be no violation. But on the Section 5 issue, isn't the key question whether there was a second — whether it was an obligation to file at the time of the second transaction, that is the sale, because of the company's control at that point. And at that point, the information would have been material and would have been a different form altogether. Well, I think the issue of whether it was material to the investor or not, I think that's the standard. And that's what the trier of fact is to decide, not the trial court. The materiality, as we know, is the mixed question of fact and law. At the cases that I've read, the issue is what is material to the investor. The SEC concedes that there's no authority that requires an amendment to the S-8. They're saying that as a matter of principle, in order to not mislead the public, that the amendment should have been made. I'm a little confused. I thought there was case law. We don't have — we have some very old case law, but case law suggesting that the Section 5 requirement is transactional. So at the time of the sale, not simply at the time that they got the options, but at the time of the sale, there was an obligation. It's not a question of amending the original form. It said there was an obligation to file a form about that transaction, which was a different transaction. Is that wrong? I don't believe — I think that any obligation, that would occur in the company's K-1 filings or 10-Q filings, or 10-K, I apologize. Not in — but the allegations that the SEC has alleged is that the problem has occurred that there should have been an amendment to the form S-8. Or maybe I'm missing the entire point here. Go ahead. I apologize for that. The other issue is I think there's no evidence of scienter on behalf of Dr. Phan. All the evidence that's coming is coming from the pre-litigation testimony of Yang Tse-Yang, which occurred in another investigation of which there's even questions regarding the admissibility of that testimony. As we pointed out in our brief, there was an order of show cause issued by the trial court because there was a lack of court reporter certifications. Even when the SEC provided those certifications to the court, well after the close of discovery, well after all the briefs had been submitted, there was a — an incongruity in the amount of pages. The court reporter certifications said there was 264 pages. The transcript which the appellant received has 260 pages, and the SEC contended in their brief that there's 262 pages. Therefore, that court reporter certification itself is unreliable, and the Yang Tse-Yang testimony should have been excluded. And that's entirely the lynchpin upon which the trial court has concluded that Dr. Phan had scienter with regard to the Section 17 and Section 10 violations. So, again, we don't believe — And why should the Yang evidence have been excluded? Because, number one, there was no authentication. The Chung Declaration did not lay the foundation for its admission into evidence, and we filed multiple objections on that behalf. They tried to resurrect that by — when the trial court set the OSC reporter certifications. The reporter certification that was produced is different. It states a different page limit than the actual transcripts which were produced to all the parties in the litigation, as well as it's a different page number than what the SEC contends. So, therefore, its veracity of the actual transcript is called into question. Well, did your client challenge that authentication? Yes, we did. We challenged that at oral argument, as well. And what did the judge say with respect to this slight variation in page number? The judge disregarded it entirely. Did she say anything at all? She just asked me to move on, I believe, in the testimony. Yeah, I might, too. Yeah. Meaning, those are — if it were, you know, the court reporter comes in and says, it was 63 pages, and, in fact, we've got 20 pages, or, you know, some large disparity. But these numbers suggest, well, I was maybe counting the cover page and the final page. You know, these — And part of the problem with that, Your Honor, is that came in so late. You know, we asked for that in the discovery process. Do you have any doubt that this was, in fact, the deposition that was taken? Is there any reason for the court to have any doubt? I don't doubt that, but I doubt whatever may be in the missing pages. Again, and the second part about this — If they're missing pages, you usually know they're missing pages. Correct. But the other problem with this, Your Honor — But I'm asking you a question. Yes. Are you telling me that you think that there is a — you know, is page 999, or, you know, is there a particular page you're worried about that's not there? I only have 260 pages, Your Honor. I don't know. Well, is page 250 gone? No, Your Honor. Well, did you read the transcript? Yes, I did, Your Honor. Does it appear to follow? It appears to flow, Your Honor. Okay. But the other problem is — Well, go on. It's with that — without laying the foundation, though, the Chung declaration doesn't do the — lay the foundational element to get that into evidence. And it's that testimony which the trial court has used to try to show my client's intent, which is entirely improper. We weren't allowed to participate in that proceeding. Well, but that's a summary judgment, and if you filed a declaration, you wouldn't be able to participate in that either. But if we did file — You'd have to file some counter evidence. And we did. And we believe that there is counter evidence there regarding my client's intent. Right. But that's a different problem. But the fact that you weren't there and didn't get to participate is irrelevant. True. But we do believe that there still is a material issue of fact with regard to my client's intent on this whole matter, which should prevent a summary judgment. We submitted his declarations, which show what the actual proceedings were. Well, suppose we were focused on the sale — Yes, Your Honor. — not the original filing. What material issues of fact are there with regard to the sale? I understand that there's disputes with regard to whether this was a loan or a forgiveness of the option price and whether it was Yang or Wu who did the work and so on. Leaving all that aside, what disputes are there with regard to the sale? The dispute regarding the sale is whether it was material and should have been disclosed to the investor as to the difference in the type of payments. It's without a doubt that — No, I'm talking about the sale after Yang had the stock and then they sold it. It's the intention behind the sale, which is at issue. Now, the facts of the sale are clear. It's undisputed. The sales did occur. And it's undisputed that Fan, on behalf of his company, found the customer and arranged the sale? And he explained that in his — correct, the buyer, Rubin, he explained that in his declaration. So what's disputed about it? And it's undisputed that at that point, they hadn't paid for the stock by that point, that Yang and Wu had not paid for the stock at that juncture. That's correct. And that the money was, in fact, used — paid directly to the company and used to pay the company's debts. Right, but that was going to happen regardless. Whether if — So what's in dispute is what I want to know. The dispute is the intent behind that transaction. What dispute is there about the intent behind that transaction? It goes into the scienter element. I'm sorry? It goes into the scienter. Why? What's scienter? I mean, plainly it was sold under the control of the company and the money went to the coffers of the company. Not to under the control of the company. The company did not control who he sold it to. As the declaration makes clear, the company — when Dr. — I'm sorry, when Mr. Yang requested how to sell a block, the company gave him the name of a person who could facilitate that. That's it. They didn't tell him to do that. That's one of the issues which is in dispute. Well, I thought they did tell him because they told him that he had to pay them back, but he knew they had no place else to get the money at that point. Right. But they did not direct him specifically, you have to go to Dan Rubin, you have to do this, you have to do that. They just gave him an opportunity of where to go to sell the block. Something that puzzles me is he sells that large block of sales to Rubin on November the 1st for 76 cents a share. Yes, sir. On the same date, he's selling shares on the open market for something like $1.30 a share. What in the world is going on? It's $1.10. The difference was that this is not a high volume stock, Your Honor. In fact, I think the reason why the discount was given is because the 500,000 shares typically represents an entire day's, actually sometimes two days' worth of sales. And so I believe that it's Mr. Rubin that demanded that if you're going to sell a large chunk, they need a discount because the market volume of this company just couldn't sustain that type of volume. And how large was the block of shares that was sold for $1.10? I think it was only 10,000 shares, Your Honor. But anybody trying to maximize sales, I mean, why in the world would you sell off an asset at that huge discount? As Mr. Yang testified and stated in his declaration, he was under pressure. He was a co-participant in the venture with the Chinese government, and he did it because he was afraid that he was going to be prosecuted if the monies were not paid. He really didn't have any regard with regard to what he was going to make. His more important thing was that if he goes to China, he thought he was going to be thrown in jail. And he was going to be thrown in jail because? Because he was a participant in the UAC transaction, and he facilitated the entire deal. As he stated in his declaration that there were civil matters, whether it could be called tax evasion or something else, which I don't recall at this time, but he's stating that there were possible criminal penalties that he would face with the Chinese government if the transaction did not complete. And did he owe the money to UAC, or did Pham's company owe the money to UAC? He was a partner, actually, in UAC. That's why the SEC or the trial court ordered him to pay the value of the 50,000 shares which he transferred to his partner in UAC. You know, as I hear more and more of this, the story doesn't get any better. The story is what it is, Your Honor. It is what it is, Your Honor. You know, the facts are the facts. It wasn't an ideal situation. And the question is really whether from the facts there is a sufficient inference to be drawn regarding intent that nothing else is needed. I think, as I understand this case, the primary issue is what was the purpose of the essay? Because that's what the actual allegations and the violations which the SEC is contending is. The essay was clearly done for the consulting services. Hardcourt was clearly going to receive up to $1.25 million in this transaction. The issue up to? Well, the deal was $1.25. It ends up they don't get that. Correct. Correct. They did not get that. But the deal was that they were always going to receive payment. Now, the SEC contends that the services were not performed. They may later take a backseat to that position. But the issue is was there a duty to amend the essay? I think that is a material issue here. If I'm an investor and I read the essay and it says, okay, here's a stock option to be exercised, da-da-da-da-da. Payment has to be made now. And that's what I'm told. Then the story that turns out to be true is later told and I'm asked, does that make any difference to you and your sense of whether this is a company you want to invest in? My answer is yes. And my answer would be it wouldn't be because the issue is you're hiring this consultant to bring you business opportunities in China. If you don't change the transaction from his demand of the option versus getting the shares first, the work doesn't get done. The most important fact to the investor in my mind would be, are you getting the opportunities in China or not? Because that's the only way this company will grow. But as soon as I learn all of this other stuff, I begin to think, you know, there's something squirrelly going on here. I'm not sure if I want my money there. I may go off and, you know, I think I may put it in the widow's and orphan stock instead of this. Right, but shouldn't that be something that the actual trier of fact should decide rather than the trial court? Well, I think the trier of fact just gets to decide, is this material to an average investor? Right. My answer would be yes. And I understand the client, Your Honor's position. Any other questions, Your Honor? Oh, you have a very pleasant demeanor. Thank you, Your Honor. What about, is there anything different about the other causes of action from the Section 5 causes of action that is worth knowing about? The only issue is the scienter argument. I don't believe that there is enough there to impute scienter on behalf of Dr. Phan. I think at a minimum he should be entitled to a trial. But there's no scienter in the Section 5 issue? Scienter's not required in Section 5, Your Honor. It's purely transactional based. Right. So essentially your whole argument has been only about, has not been about Section 5, because Section 5 doesn't have a scienter argument. Correct.  I'm not conceding to Section 5. I'm not conceding that, because again, I believe that this, with regard to the Section 5 violation, it's only if the change in the payment terms of the option was material would there be a Section 5 violation. And I would concede that, I understand Your Honor's point with regard to, that you would view that as being material. But I think that it actually, that the focus is on whether the deal gets done for the company versus it doesn't get done. And that's the material issue which an investor would decide on rather than the amount of the payment or the different form of the transaction. This was a company whose stated purpose in its 10-Ks and in all of its filings and all of its press releases is that we're going to China to do business with the Chinese. But isn't the SEC's theory that this was not properly an essay registration at all, at least by the point of the sale? Because it was a, the sale at least made clear that this was a capital raising function and not an option for services performed. Isn't that their basic theory? I don't believe so. I think their initial theory was that the work was never done and that it was a pure capital raising. Maybe their initial theory. But isn't their present theory and the theory that there are certainly sufficiently expressed below that this was just never, it at least became clear by the point of the sale if it wasn't clear before that this was not what it purported to be. And therefore, the essay registration was just improper. But I don't believe that this was a capital raising transaction and that's what the essay. The sale certainly makes it look like one because you have a situation in which the company was finding the seller, doing the paperwork, telling them where to send the money to and using it precisely to pay the company's debts. But the company would have used this money, the 1.25 it was going to get to pay its debts regardless. The typical essay capital raising transaction is where a consultant doesn't do work, gets the stock, sells the stock and then funnels it back into the company. This is a transaction where it's undisputed that the actual work was performed. The InnoStar work was brought. The UAC deal was brought. The Chinese Oriental Satellite deal was done. The court should, I ask the court to look at it this way. If Mr. Yang had sent the monies directly to Harcourt rather than sending it directly to the other entities of which Harcourt owed money, would we even be here? I don't think we would because Harcourt was entitled to receive those funds no matter what. I think the issue should be whether the change in the payment terms was so material as a regional investor would call that into question. The company was always going to get the sums. They were going to get 1.25 million no matter what. How they were going to pay their bills is irrelevant. What happened here is that they cut out the middleman. But we have evidence that they didn't get the 1.25 and there's an agreement that they wouldn't. A post-HARC agreement that they wouldn't. That's correct. They didn't get the 1.25. They got 754,000. And they were going to get their 1.25 because they weren't and they didn't. Right. And then the question is that is that a material issue versus getting the opportunities in China? Which is, again, and at that time that was the China boom. And that was the really focal point. Thank you, Your Honor.  May it please the Court. My name is Jeffrey Tao for the Securities and Exchange Commission. Let me start by, first of all, agreeing with Judge Berzon that absolutely Dr. Fan's violations of Section 5 came in several different independent ways, including the resales of the stock through Mr. Yang, which were not registered either by the initial Form S.A. or otherwise and were not exempted either. So one of your theories, which is sufficient to sustain the Section 5 judgment, is that forgetting about the original registration and without regard to whether this change in payment was material and required an amendment, that at the time of the sale, the character of the sale was such that the summary judgment showed it that this wasn't properly an S.A. transaction at all. That is correct, Your Honor. The proceeds were directed towards Hart Court's benefit and Fan was involved in the resale to begin with. And additionally, it also, Section 5 also was violated because Form S.A. contained misrepresentations and omissions and the transaction actually did not resemble what was registered. But that one, it seems to me, to be a harder argument in summary judgment because we, there is a dispute about whether this was a loan or wasn't a loan. The judge was almost, at least on the record, he said that the change was to they had to pay for it, so they didn't have to pay for it. But that's not accurate because the representation was that they were going to have to pay for it, but later. So it seems to me that you're, on summary judgment at least, in not very good shape on the initial registration issue. Well, I don't know if I agree with us not being in good shape as to the initial registration issue, but absolutely as to the subsequent resales, there's no question that there was no registration statement in effect for those, Your Honor. But that turns, does that turn on our understanding that this was a capital raising transaction? In other words, would the, I guess my question is, would the original S.A. registration continue on if there weren't facts about the, there would be no obligation, this is what I understand. There would be no obligation to register the sale if it weren't in control of the company. Is that right? That is correct, Your Honor. So it does turn on our understanding that the sale was under the control of the company. That is correct, Your Honor. In a normal S.A. transaction in which there is no control or capital raising function or where there are no other indications in the record that it is a capital raising function, then the consultant might be subject to an exemption, for example, as not being an issuer or an underwriter or a dealer. And in that situation, I know further registration would be necessary. But that is not the case, Your Honor. Moving on to, and also, Your Honor, you're correct that there's no scienter requirement for Section 5. So what about the other causes of action as to which there is a scienter requirement? Well, first of all, I should start by saying that if you notice in the, in Dr. Fann's appellate brief, scienter is raised literally in just two sentences with a complete conclusory argument and no real argument in there. So I would submit that scienter was not actually preserved on appeal. But that being said, there is overwhelming evidence as to Dr. Fann's scienter. But this scienter has to be with regard to the actual filling out of the S.A. registration form that was filled out. Is that right? Well, as well as to the capital raising function, because that was misrepresented as well. The idea that the proceeds were supposed to be used for purely compensatory purposes. But that would require saying that at the time they filled out the S.A. form that they were lying. Well. Or misrepresenting that. Well, Your Honor, although prearrangement is not necessary for purposes of Section 5 liability, I would actually submit that the record is fairly clear that from the beginning this was a capital raising function. But nevertheless, as to the misrepresentations at the time of the filing, the scienter would be present for that because Dr. Fann negotiated the fee and option agreements and also signed the form S.A. And at the time of the filing, it was known that Yang Wu was not a consultant and had no special talents. And one of the bases for. Well, but that's disputed too. I mean, that's certainly disputed. I mean, they claim that Yang Wu did do work and what. She did not. She did have special talents, that she was part of this. It was a husband-wife team that was doing this work. But actually, Your Honor, as to consulting services particularly, there's no dispute that she did not do any of those. And if you read, as you read the S.A. and attachments, it's clear that the special talents are supposed to be hers personally. And so, and that was known at the time. It was also known at the time of filing that the form S.A. was filed on the same day that the shares were authorized. So clearly, there was no written notice or prepayment. So as of the date of that, those things were known to, or known to Dr. Pan. But that would have to be material, and it's not really clear why it's material that somebody was going to pay for it in advance or essentially have an IOU and pay for it later. I mean, the district court said that there was an agreement that they weren't going to pay at all, but that's not the record. So the only difference is between paying up front and paying later. Well, not exactly, Your Honor. First of all, the fundamental nature of the transaction when you have a stock option is it's supposed to be delayed compensation. And in those circumstances, the recipient of the stock options, for example, if the market moves in their favor, they can sell it for a profit. If it doesn't move in their favor, they won't sell at all. They won't lose anything. As this transaction actually, because of the lack of prepayment and written notice, as this transaction was actually set up and implemented, there was actually no real prospect for the consultant to make any money whatsoever. And that hardly makes it a compensatory transaction. It would have had to go up quite a bit considering the 30 percent discount and the fact that the bottom line is that because there was no prepayment, there was actually no the issue, the exercise of the shares ended up being at the behest of the issuer rather than the choice of the consultant. And add that to the fact that the shares actually came to rest for a very short time with the consultant before he was forced to sell them. And then he sold them under economically irrational circumstances. That's later. We're talking about the time when the form was filled out. Yes, Your Honor. And also under anti-fraud. Their story is that, you know, at the time the form was filled out, they didn't know when they were going to have to pay it back. Well, that story actually depends upon also – well, moving slowly forward in time, Your Honor, it also depends upon the idea of there being a demand for payment forcing the sales. The story actually depends on that. And as the district court correctly found, that was a sham because that version of events came forward in the declarations, and that's slightly contradicted by the earlier testimony by both Yang and Fan. Fan had earlier testified in his deposition that he had agreed to a six-month promissory note and then in September or October 1999. But his subsequent story depends upon in October 1999 him demanding payment. Let me ask you this. With respect to the material misrepresentation in Scianter under Section 17 and under Rule 10b-5, is it only what was known at the time of filing the S-8, or is it what is known later and some obligation to revise and reveal information? Do we look at Scianter only at that initial point of the filing of the S-8, or do we look at Scianter later as well? Well, first let me say that under Section 17a-2 and a-3, there is no Scianter requirement, only under 17a-1. But under anti-fraud principles, we would submit that there would be a duty to amend. So therefore, the Scianter would be measured for all the misrepresentations throughout. So on that theory, it's not the end of the story when we say, well, maybe he didn't have this intent to mislead at the time of filing the S-8, even if the intent to mislead shows up later when he starts to engage in all these other transactions because he didn't amend to reveal them. That is correct, Your Honor. That is absolutely true. Because of the duty to amend under the anti-fraud principles, as the misrepresentations continue and as things begin, Scianter would be measured as it goes forward and not just at that point. Does your brief, because I don't remember, provide case support for the updating proposition with regard to the anti-fraud provisions? I don't know that it gives case support, Your Honor. I believe that the ---- Footnote 20 in your brief. Footnote 20, yes, Your Honor. As to a particular case support for the duty to amend proposition, Your Honor, I know that Federal courts have not necessarily been very clear in how they've articulated the breadth or the scope of the duty to amend under anti-fraud principles. But the gist of it, as I understand it, is that as long as the representation is still live in the investor's minds, for example, that would be a situation where there would be a duty to amend. In this situation, the changes, the secret changes to the S.A. and attachments occurred very shortly after the S.A. was filed, so clearly those would still be alive in an investor's mind. Moreover, this was not a situation in which changes in the economy or things just happened to happen. These were situations where their own affirmative actions were making what was originally their misleading. They were the ones secretly modifying the agreements. They were the ones secretly changing the terms. Do you happen to know whether the cases cited in Footnote 20 in the CFR site there deal with the anti-fraud provisions? With the anti-fraud? One moment, Your Honor. Excuse me. I believe the IBM case does deal with the anti-fraud provisions, Your Honor. And I'm not completely certain about the Weiner case. And how nice to come on this, I take it? Not that I'm aware of, Your Honor. As to the materiality issue, Your Honor, in a case addressing somewhat similar facts in the Southern District of New York, in Stock Point, that court held that, on summary judgment, that misrepresentations as to the capital-raising nature of a form S.A.T.E. were material. If you're right about an obligation to amend so that an S.A.T.E. that remains on file after it becomes clear that it's a capital-raising venture, then you may be right. The question is pushing the capital-raising venture back to the beginning on the current record, whether we could do that as a matter of law. That seems to me to be the hard problem. I don't have much problem with the capital-raising venture by the time of the sale, but to say that I know we could tell on this record uncontestedly that it was true at the time of the form seems more difficult. Yes, Your Honor. Although I would submit, again, that since the entire story about changing it after the fact, it really does depend upon the idea that, well, we demanded payment and therefore everything had to change. But again, the idea of them demanding payment was slightly contradicted by both Afan and Yang's early testimony. When discussing his obligation to pay, to send the proceeds of the sales to sell and send the proceeds to Harcourt's creditors, in Yang's 2001 investigative testimony, he makes it very clear that he didn't want to sell. He didn't understand why he had to sell. And he describes then as, quote-unquote, taking his shares away or so-called borrowing his shares without returning the shares. So that hardly seems consistent with his later declaration saying that this was all because of a legitimate demand for payment. So I would actually submit that taking a step further back, the entire thing from the beginning was a capital-raising transaction. And I agree, it is the record is far clearer as to the capital-raising nature overall and also as to the specific misrepresentations regarding the form of payment and regarding the, excuse me, the written notice and the advance prepayment. But I think the entire story is actually dependent upon something that is slightly contradicted. And within the district court's discretion, it found it to be a sham. So I would actually submit that. Well, that's not discretion. I mean, that's a question of summary judgment. It's a question of whether it was a fair inference from the facts. Well, actually, Your Honor, under Kennedy. It was a sham at the beginning. Actually, my understanding under Kennedy, Your Honor, is that in order to find a sham, the district court is required to make a fact-finding as to whether or not there's a sufficient contradiction to make it a sham. You can't do that under summary judgment if there's conflicting evidence. I understand that, Your Honor. But my understanding of the Ninth Circuit case law is they describe it in terms of fact-finding for purposes of the admission or exclusion of evidence. I'm not sure I'm getting that. This is still an ordinary summary judgment. Yes, Your Honor. But if you'll indulge me for one moment. Under Kennedy v. Allied Mutual at 952 F. 2nd, 262 Penn Site 267, this Court says, therefore, Oh, you're saying that that's a matter of evidence. Yes. That the district court must make a factual determination that the contradiction was actually a sham. In this case, that is what the – that is the factual determination that the district court made. So I would actually submit that because it's a factual determination, it wouldn't just be under the normal tribal issue of fact standard for reviewing that.  I mean, even aside from the economic rationality and all those other things, it falls apart right there. And – I'm not sure I understand why. Their original story was still that it was a loan. Still that it was a loan, but simply that it was a loan that had to be repaid in six months rather than a loan that was repayable on demand. Is that the difference? That's correct, Your Honor. And in – under the original testimony, in September or October 1999, he agreed to give them six months. But under his new story, in October 1999, he demanded payment. He might have agreed to give them six months and then made the demand, you know, in contradiction of his earlier promise. I don't see what's so contradictory about that or sham-like. But there's nothing that – there's no place in which he says that. Now, it's true, if he explained why there was a contradiction or explained why there was a discrepancy, then the sham finding might be inappropriate. But this discrepancy doesn't really go to the core of the story. I mean, in any way particularly. But it does, Your Honor, because if there was no legitimate demand for payment in October 1999, then there was no reason for Fan to – There may have been illegitimate demand for payment, but it was still a demand for payment. Except both Fan and Yang's story hinges – depends upon – Fan's explanation for why he demanded payment was that in October 1999, he needed the money and it was appropriate for him to demand it. Yang's story, likewise, on his declaration is that he didn't want to sell it, but in October 1999, he owed the money and therefore he paid it. If it's true, however, that they had agreed to a six-month promissory note, then Yang, who did not want – even his declaration says he didn't want to sell it at that time because he wanted to hold on to it, there's no reason for him to sell it, particularly under circumstances where he lost money on the transaction while at the same time making money on the side on the – in the public market through his own shoes. I'm not very impressed with this. It seems to me that there are myriad inferences what could draw as to why somebody who had a six-month promissory note would nonetheless, if they had a business relationship with somebody who was demanding they pay it back earlier, pay it back earlier. It just doesn't seem that the – that there's a sufficient contradiction between the two to disregard the whole affidavit. Well, and then you have Yang's – Yang's affidavit – you also have Yang's prior testimony in which he said he was upset that he had to give the money. He didn't want to and that he just – he characterized the shares as being taken away rather than just paying in debt. He characterized – he characterized them as being so-called borrowed. And so it – But all of that is only relevant anyway to the upgrading – updating question. I mean, in other words, none of that goes to the issue of what – whether there was a material representation, misrepresentation with Sienter on the original form. So, you know, and if there's an updating obligation, it seems to me you're in pretty good shape anyway. Yes, Your Honor. The problem is whether there is an updating obligation. Yes, Your Honor. I've got another question for you. Yes. As to the original proposition with respect to the S-8 and whether or not it's a true S-8 filing or whether it's something else, one of your contentions is that, well, by the time he ends up selling it and he's selling it under the control of the company of Hardcourt, it turns out to be capital raising. Yes. And therefore, it's not a true S-8. Well, under the terms of the S-8 filing, if that had actually been complied with in terms of how it was written, that looks like capital raising to me. That is to say it required him to have paid up front $1.25 million cash, which he didn't do. Yes, Your Honor. So later on, when he starts making these sales through Rubin and then using that money to pay off debts owned by the company, okay, that's essentially providing capital to the company, but it's providing a lot less capital to the company. So instead of raising capital by this method, in fact, less capital is being raised. Yes, Your Honor. So what's going on here? That I could not even hesitate to guess as to why. Well, no, what's going on here legally, not actually? Legally. I mean, under the S-8, it's capital raising, $1.25 million. Under what they're doing, it's capital raising, but a heck of a lot less. Yes, Your Honor. So why is that a violation? I mean, why is that a violation premised upon capital raising when instead of raising capital, they're throwing capital away? Well, as to the first instance, Your Honor, in which he actually – in which he paid them directly and there was no – he prepaid it for it, for example. Yes, if he prepays, they raise $1.25 million. Well, as to whether or not that would be deemed capital raising. I mean, the overall function of the transaction, taking the whole thing start to finish, is they had a written obligation which he was supposed to pay $1.25 million, which he has not fulfilled. They replaced that obligation with this series of transactions in which various debtors – various creditors of the company are paid off but far less than $1.25 million. So the movement from the initial transaction is set forward in 2.58 to what they actually do. They're throwing money away. Yes, Your Honor. Rather than raising capital. But in the first hypothetical in which he does prepay for it – Not hypothetical. That's the statement in the essay. Well, yes, Your Honor. But the idea is that if you use the consultant as a conduit, basically the real transaction is between the – at that point becomes the issuer to the public. In a situation where there's prepayment and then there's no control of the subsequent resales, then there's no problem because the consultant is not just a flow-through to the public. And I was baffled by the same thing at first because it appears that any of these transactions was capital raising in the sense that the company was going to get $1.25 million. I gathered – I mean, what I eventually gathered was that there is simply a legal distinction between getting $1.25 million in return for services and getting $1.25 million essentially not really for the services. I mean, is that basically what you're saying? Well, it's not necessarily tied to the services, but it's tied to the – the rationale behind giving this procedure is that in a legitimate compensatory offering to an employee or a consultant – It's not that you're not raising money. You are raising money. You are. But the idea is that the consultant or employee, first of all, is familiar enough with the employer's business that the risks are not there and the need for a full-on registration process might not be the same as it would be if it were actually going to the public. But in terms of what the outside world has to know, I think what Judge Fletcher is asking, why is it still pertinent to them that this company is looking for $1.25 million even if it's – it's going to have $1.25 million more? Why isn't that – why isn't that just as capital raising? Well, it – well, I should start by just – the rationale is not only the familiarity with the company, but also that it's purely for compensation. The idea is that you're – you know, if you're talking about an employee, for example, you're retaining them. You're giving them the golden handcuffs for saying, well, as you continue to work for me, I'll give you more shares and then they'll ask accordingly. Is this all one reason why the timing of the payment is material or the change in the payment? Because the original – what was represented on the S-8, the company wouldn't have known when it was going to get the $1.25 million. Yes, Your Honor. Which means that it didn't represent an immediate need for capital because they couldn't – it is possible they wouldn't have gotten the money for – Forever. Forever or for 18 months or something like that. Yes, Your Honor. If the deal was, in fact, what it later turned out to be, which is we'll lend you money and we'll give you the shares now, but we'll ask you to pay for it whenever we feel like it, that then becomes much more of a capital raising. Exactly. And in that situation, it really has an indication that the real transaction is – And that the company needs the money. Exactly. And some need for the money or at least has a route to obtaining capital. But it's a need for the money and on its own schedule rather than on the employee's schedule. Exactly, Your Honor. And that is a major difference. Usually the consultant determines when they want to sell it and they presume they'll do it under economically rational circumstances and they might never sell it. Whereas when you weigh the prepayment and the written notification, suddenly the issuer is able to demand when it gets the money. And in this particular case, it ends up doing it under highly unusual circumstances. This is not in the record, but normally in an S.A. transaction, when you're dealing with employees, you give them options because you want to retain them and they may invest as you go along. With a consultant, it's actually more common for them to just grant them the shares in exchange for services with the idea that you're not trying to retain them. And so the idea here that, first of all, they're giving them options and then – And this transaction was neither, as it turned out. They were neither giving them the shares nor were they giving them options to be exercised later. They were giving them shares but making them pay for it. Yes, exactly, which is more typical in the employee context. But in the consultant context, that's a little unusual. Unless the Court has any further questions, that concludes my presentation. All right. Thank you. Thank you. Unless the Court has any questions. Thank you. Thank you. A little argued case. We appreciate your work in the matter and submit it. And the Court will recess until 9 a.m. tomorrow morning.
judges: Pregerson, W. Fletcher, Berzon